IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL JOYCE,

               *Plaintiff,*

    v.

LIFE INSURANCE COMPANY OF NORTH
AMERICA,

               *Defendant.*

Civil Action No. 2:18-cv-1293

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff, Michael Joyce ("Joyce"), sued Defendant, Life Insurance Company of North America ("LINA"), under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), codified at 29 U.S.C. § 1132(a)(1)(B). Joyce alleges that LINA wrongfully denied his claim for long-term disability ("LTD") benefits under the employee plan sponsored by his employer, Waste Management, Inc. ("Waste Management"). (ECF No. 43, ¶ 4). Joyce's regular job occupation was "Garbage-Collection Supervisor." (ECF No. 56-1). The issue at hand arises out of a denial of LTD benefits starting with an incident in August 2016.

Both parties moved for Summary Judgment (ECF Nos. 54 and 58). Briefing is complete, and oral argument occurred on October 28, 2020. Ultimately, the Court must determine whether LINA abused its discretion as the benefit plan administrator when it determined that Joyce was not "disabled" from his "Regular Occupation" under the plan and denied his claim for LTD benefits. For the reasons set forth herein, the Court grants Joyce's Motion for Summary Judgment (ECF No. 58) and denies LINA's Motion for Summary Judgment (ECF No. 54) as moot.

1

**FACTUAL HISTORY**

Waste Management, a waste management and environmental services company, employed Joyce as a Garbage-Collection Supervisor or Route Manager. (ECF No. 56-1, p. 2). His duties included supervising and coordinating the activities of workers, assigning routes and trucks to workers and other supervisory roles. (*Id.*).

As a benefit of his employment, Joyce participated in Waste Management's employee welfare plan, which included LTD benefits issued by LINA. (ECF No. 70, pp. 2–3). LINA evaluated LTD claims under the Policy. (ECF No. 56-2). The Policy contained a two-tiered definition of disability, which changed from an initial "Regular Occupation" definition of disability to a heightened "Any Occupation" definition of disability "after disability benefits have been payable for twenty-four months." (*Id.* at 7). The Policy language states:

**Definition of Disability/Disabled**

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1. unable to perform the material duties of his or her Regular Occupation. For drivers only, this includes being unable to meet the driving requirements as outlined under the Department of Transportation regulations; and

2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:

1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and

2. unable to earn 60% of more of his or her Indexed Earnings.

(ECF No. 56-2, p. 7). "Regular Occupation" is defined as

[t]he occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, the Insurance Company will consider the duties of the

occupation as it is normally performed in the general labor market in the national economy.  It is not work tasks that are performed for a specific employer or at a specific location.

(*Id.* at 26).  The Policy also contained a limited twelve-month benefit period for certain illnesses.

The Insurance Company will pay Disability Benefits on a limited basis during an Employee's lifetime for a Disability caused by, or contributed to by, any one or more of the following conditions.  Once 12 monthly Disability Benefits have been paid, no further benefits will be payable for any of the following conditions:

    1)    Alcoholism
    2)    Anxiety disorders
    3)    Delusional (paranoid) disorders
    4)    Depressive disorders
    5)    Drug addiction or abuse
    6)    Eating disorders
    7)    Mental illness
    8)    Somatoform disorders (psychosomatic illness)

(*Id.* at 18).

Under the Policy, the claimant must first establish, then prove on an ongoing basis, his disability to remain eligible for LTD benefits.  (*Id.* at 10).  The Policy contains an Elimination Period of 180 days, which is "the period of time an Employee must be continuously Disabled before Disability Benefits are payable."  (*Id.* at 8, 15).  "If you are still disabled after 26 weeks and are eligible for LTD benefits, your LTD benefits pick up where your [short-term disability ("STD")] benefits leave off."  (ECF No. 62, p. 9).  Had Joyce's STD benefits not been terminated, his Elimination Period would have ended February 25, 2017, at which point he would have been allowed to apply for LTD benefits.  (ECF No. 66, ¶¶ 15–16); (ECF No. 55, ¶ 16).[1]

---

[1] The Policy in contention only covers LTD benefits, not STD benefits.  (ECF No. 56-2).  Joyce and LINA settled claims related to Joyce's STD claim.  The Court stayed those proceedings following the settlement of Joyce's STD benefits claim to permit LINA to perform an administrative review of Joyce's LTD benefits claim.  (ECF No. 31).

### A.     The Incident

On the night of August 28, 2016, a tree struck Joyce in the back of the head during a storm. (ECF No. 70, ¶ 3).  He lost consciousness but crawled to his driveway where he called a friend and 911.  (*Id.*).  Medical records showed that Joyce did not remember making the calls and could not remember the accident.  (*Id.*).  He was admitted to Weirton Medical Center for two days.  (*Id.*). The staff at Weirton found Joyce "in and out of consciousness" and that he had a "sluggish pupillary response, [was] alert to self only, [was] unsure of [his date of birth] and social security number" and that "he was perseverating . . . for most of the ER stay." (ECF No. 56-5, pp. 2, 8).  At the time of the incident, Joyce was forty-nine years old.  (ECF No. 55, ¶ 6); (ECF No. 66, ¶ 6).

The day following his release from the hospital, Joyce sought treatment from Dr. David M. Lobas, MD, a neurologist.  Dr. Lobas concluded that Joyce suffered from a concussion and recommended further testing, including an electroencephalogram (EEG) and magnetic resonance imaging scan (MRI) of his brain.  Dr. Lobas confirmed that Joyce's computed tomography (CT) scans were unremarkable on the date of the incident.  At the visit, Joyce was alert and his neurologic status was stable.  (ECF No. 56-6, p. 2).

On August 31, 2016, Joyce saw his family doctor, who referred him to neurologist Dr. Rami Ausi, MD, who first treated Joyce in September 2016.  (*Id.*).  On that day, Dr. Ausi noted, "patient has a constellation of symptoms, including cognitive dysfunction, headaches, frustration, visual problems, and visuospatial difficulties most consistent with post-concussive syndrome . . . ." (ECF No. 56-7, p. 5).  Dr. Ausi diagnosed Joyce with post-concussive syndrome and stressed the importance of resting the brain, minimizing mental activities and reducing visual stimulation to accelerate recovery.  (*Id.*).  He also notated that Joyce "certainly should not go back to work or drive at this point."  (*Id.*).

4

### B.     Joyce's STD and LTD Claims

Following the August 2016 incident, Joyce applied for STD benefits under Waste Management's employee welfare benefit plan.  (ECF No. 70, ¶ 4); (ECF No. 61, ¶ 4).  LINA was appointed as Claim Fiduciary and, within the scope of that appointment, had the discretion to review, evaluate and determine claims for both STD and LTD benefits.  (ECF No. 56-3).  LINA acknowledged receipt of Joyce's STD claim by letter dated September 9, 2016 and established Joyce's STD claim with coverage for Joyce's pre-disability earnings of $80,000 per year.  (*Id.*).

LINA issued a February 17, 2017 decision by Ahmed G., Disability Claim Manager, terminating Joyce's STD benefits on December 21, 2016.  (ECF No. 43, ¶¶ 8–9); (ECF No. 55, ¶ 21).  LINA explained, "[w]hile we are not disputing your diagnosis or symptoms you are having, we did not receive any medical notes from your provider before the deadline of February 15, 2017."  (ECF No. 62, pp. 14–15).  LINA's February 17, 2017 decision reversed its earlier STD benefit approval, nine days before the transition from STD to LTD benefits.  (ECF No. 70, ¶¶ 12–13).

Before administering the February 17 decision, LINA requested information from Dr. Bruce Wright, MD, Joyce's treating psychiatrist.  (ECF No. 70, ¶ 10).  In early January 2017, Dr. Wright's office faxed to LINA Dr. Wright's office notes from December 20 and 21, 2016 and a Behavioral Health Questionnaire.  (*Id.*).  Under the heading "Return to Work Plan," Dr. Wright recorded, "severe symptoms prohibit any work at this time," and where asked to share the patient's "functional, psychological, and cognitive abilities and limitations," Dr. Wright wrote, "severe depression/anxiety and cognitive problems related to concussion."  (ECF No. 56-19).  LINA sent a letter in early January 2017 to Dr. Wright acknowledging that it reviewed his letter but asked for clarification.  (ECF No. 78, p. 16).  Dr. Wright responded that Joyce was unable to complete even basic tasks considering his "severe and debilitating symptoms."  (ECF No. 62, pp. 27–31).

Dr. Ausi also sent LINA information in December 2016.  Dr. Ausi supplied LINA with copies of medications prescribed to Joyce and a completed Medical Request Form.  Dr. Ausi diagnosed Joyce with post-concussive syndrome and "major depressive disorder."  He restricted Joyce from "intense mental activity, multitasking, and prolonged driving" and specified that Joyce could not return to work, even if his employer provided accommodations.  His best estimate for a return to work without restrictions was "6 months."  (ECF No. 62, pp. 31–34).  Even so, LINA ended STD coverage December 21, 2016, thereby precluding Joyce from obtaining LTD benefits.

### C.    Joyce's Treatment, Social Security Disability Benefits and LINA's Denial of LTD Benefits

Following the tree incident, Joyce received treatment from Dr. Ausi; Dr. Bruce A. Wright, MD; and Dr. James Baird, Ph.D.  Throughout treatment, Dr. Ausi noted some improvement with Joyce and provided updates to LINA.  LINA's medical request form asked, "[c]ould your patient return to work at this time if accommodations were made?"  "If no, based on your experience, what is your best estimate?"  In his September 20, 2016; October 20, 2016 and December 7, 2016 evaluations, Dr. Ausi answered "No" each time, and his best estimate increased from two to three months in September 2016 to six months in December 2016.  (ECF No. 56-8); (ECF No. 56-9); (ECF No. 56-10).

Joyce's treatment regime with Dr. Ausi consisted of a combination of medication and periodic follow-up consultations.  *See* (ECF No. 56-7); (ECF No. 56-8); (ECF No. 56-9); (ECF No. 56-10); (ECF No. 56-11); (ECF No. 56-12); (ECF No. 56-13); (ECF No. 56-14); (ECF No. 56-15); (ECF No. 56-16).  By February 7, 2017, Dr. Ausi and Joyce discussed a plan to return to work, at least part-time and as-tolerated.  Dr. Ausi noted that Joyce "should take a break" if he experienced any difficulty focusing during the workday.  (ECF No. 56-16, p. 2).

6

Joyce also sought treatment from Dr. Wright, a psychiatrist.  Dr. Wright noted that Joyce's neurological workups with Dr. Ausi were "unremarkable."  (ECF No. 56-17, p. 12).  Dr. Wright was Joyce's primary treating mental health provider from December 2016 through September 2019 and provided treatment about twenty-one times, generally once per month.  (*Id.* at 3–16).  On a few occasions, Dr. Wright treated Joyce twice in one month.  (*Id.*).  Joyce had good days and bad days when he appeared for treatment.   Dr. Wright completed a Behavioral Health Questionnaire for Joyce at the end of December 2016.  (ECF No. 56-19).

On a phone call with a representative from LINA in January 2017, Joyce reported that Dr. Wright was very concerned about him and that Dr. Wright thought Joyce would need to be admitted as an inpatient at a hospital.  But Joyce stated he "picked himself up" and that "things are better now."  He could watch television, read a book without headaches and experienced no sensitivity to light.  He planned to return to work but cited his post-concussive symptoms as the medical issue keeping him out of work.  (ECF No. 56-20).

In May 2017, Joyce returned to work at Waste Management for about three weeks.  (ECF No. 56-20).   Dr. Wright supported Joyce's return to work but noted that Joyce was "overwhelmingly unsuccessful in his attempt."  (ECF No. 56-18); *see also* (ECF No. 56-17, pp. 5–6).

Dr. Wright referred Joyce for a neuropsychological evaluation with Dr. Baird, a psychologist at Dr. Wright's practice, in August 2017.  (ECF No. 56-22).  Dr. Baird concluded that Joyce was disabled, at least for purposes of a career "with the complexities he described in [his] former position."  (*Id.* at 5).

In December 2017, the Social Security Administration ("SSA") awarded Joyce Social Security Disability ("SSD") benefits after determining that Joyce became disabled on August 28, 2016. (ECF No. 64, p. 113). His award of benefits began in February 2017. (*Id.*).

In January 2018, Dr. Les Kertay, Ph.D., a LINA Medical Director and licensed psychologist specializing in psychology and neuropsychology, reviewed Joyce's medical records and information submitted by Joyce and his providers. Dr. Kertay determined that the medical information on file did not support functional impairment of Joyce. Dr. Kertay concluded that Joyce's reported psychiatric symptoms did not suggest any issue or impediment for Joyce to work. Dr. Kertay also noted that Joyce's providers did not include complete testing nor appropriately specific findings to support Joyce's claimed impairment. Dr. Kertay also recognized that the infrequent nature of Joyce's treatments also suggested a lack of impairment. (ECF No. 56-23).

In the summers of 2018 and 2019, Joyce visited Hilton Head, South Carolina where his father lived. (ECF No. 56-17, pp. 20, 23). In March 2019, Joyce reported to Dr. David A. Lombardi, Ph.D., a psychiatrist and colleague of Dr. Wright, that "he had been spending the entire day bar hopping and shopping" with a female friend recently. (ECF No. 56-24). Dr. Lombardi noted that loneliness seemed to envelop Joyce when he was alone. (*Id.*).

In July 2019, Joyce completed an Activities Questionnaire, where he reported that he regularly exercised, cooked, cleaned, did laundry, shopped and performed yard work. He also drove daily and used a computer. (ECF No. 56-25). Joyce also conveyed that although he tried to return to work, he was unable to do so because he was physically tired and had severe memory issues. (*Id.* at 4).

In early August 2019, Dr. Kertay provided an updated specialist review based on the recent medical records and other documents in the administrative record. Dr. Kertay determined that

Joyce was not functionally limited from a psychiatric, psychological or neuropsychological perspective.  Dr. Kertay also noted that "[f]urther specification of injury severity is hampered by the fact that the original medical records from the injury are not made available for review."  (ECF No. 56-26, p. 2).  Dr. Kertay contended that many conclusions of Joyce's providers were not appropriately supported by testing, and the alleged perpetual nature of Joyce's impairment considering the accident at issue was unusual in the first place.  According to Dr. Kertay, many of Joyce's available medical records were "broadly benign," Joyce's treatment intensity was low, and Joyce remained on a static medication regime.  (*Id.* at 4).  In the end, Dr. Kertay concluded that "the information in the file is consistent with waxing and waning reported symptoms of depression and anxiety . . . [T]he information available for review does not provide support for functional, psychological, or neuropsychological condition."  (*Id.* at 6).

On September 23, 2019, LINA denied Joyce's LTD benefits claim.  (ECF No. 56-27).  In October 2019, Dr. Kertay authored an addendum to his specialist review after Joyce's psychiatrist, Dr. Wright, responded to questions related to Joyce's condition.  After a review of the responses, Dr. Kertay reaffirmed his determination that Joyce was not limited.  Dr. Kertay noted that there was no new evidence of impairment, particularly because Dr. Wright did not submit any new evidence.  (ECF No. 56-28).

D.    **LINA's Denial of LTD Benefits Appeal**

In February 2020, Joyce appealed LINA's decision to deny his LTD benefits and reattached the letters he sent LINA and included records from the administrative process with the SSA.  (ECF No. 56-29, pp. 4, 12).

In March 2020, Dr. Edan Critchfield, Psy.D., a licensed clinical psychologist, performed a peer review of Joyce's administrative record and reached out to Joyce's providers.  Dr. Critchfield determined that "[f]rom a neuropsychological perspective, for the time period of 8/29/2016

9

forward, the available medical records do not support cognitive deficits or psychological symptoms of a nature or severity to result in functional impairment necessitating restrictions or limitations." (ECF No. 56-30, p. 8). Dr. Critchfield noted that Joyce managed his depression and related symptoms on an outpatient basis with no significant incidents. The only neuropsychological evaluation on file for Joyce from 2017 lacked appropriate assessments of performance validity to ensure the reliability of the results. Although Dr. Critchfield never examined Joyce, he determined the nature and severity of Joyce's initial incident was not of the type to create perpetual cognitive deficits as Joyce claimed. (*Id.*).

In March 2020, Dr. Leon Meytin, MD, a neurologist, also submitted a peer review in which he determined that Joyce was not physically impaired from a neurological standpoint. Dr. Meytin found that Joyce's headaches had decreased to the point of near non-existence by late 2018 according to the medical records. As a result, Dr. Meytin concluded, "there is no clear neurological evidence that would preclude the claimant from performing sustained full-time work activities." (ECF No. 56-31).

On March 23, 2020, LINA upheld its decision to deny Joyce's LTD benefits claim. (ECF No. 56-32). Joyce moved to restart the litigation on March 25, 2020. (ECF No. 36).

## STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must

view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255.   It refrains from making credibility determinations or weighing evidence. *Id.*   "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

"When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining for each side whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (3d ed. 2016)).   Under the same rule, if upon review of a party's motion for summary judgment, the Court, viewing the evidence in the light most favorable to the non-moving party, enters summary judgment for the moving party, the Court may properly declare the opposing party's cross-motion for summary judgment as moot. *Beenick v. LeFebvre*, 684 F. App'x 200, 205–06 (3d Cir. 2017).

The Supreme Court held that "a denial of benefits challenged under [§ 502(a)(1)(B)] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1988).   If the plan grants the administrator discretionary authority, the Court must review the benefit decision for an abuse of discretion. *Id.*   The Court of Appeals for the Third Circuit recognized this standard of review as either the "arbitrary and capricious" standard or the "abuse of discretion" standard. *See Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 n.6 (3d Cir. 2010).

## ANALYSIS

ERISA's "comprehensive and complex scheme" regulates employee benefit plans. *Pini v. First Unum Life Ins. Co.*, 981 F. Supp. 2d 386, 405 (W.D. Pa. 2013) (quoting *Estate of Kensinger v. URL Pharma, Inc.*, 674 F.3d 131, 135 (3d Cir. 2012)).  When an employer establishes a benefit plan, ERISA seeks "to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).  A fiduciary of the plan must act "in accordance with the documents and instruments governing the plan," so long as the "documents and instruments" follow statutory requirements.  29 U.S.C. § 1104(a)(1)(D); *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 288 (2009).

Joyce brings his claims under § 502(a)(1)(B) of ERISA.  The provisions of § 502(a)(1)(B), also known as 29 U.S.C. § 1132(a)(1)(B), permit participants "to recover benefits due to him under the terms of his plan" and "to enforce his rights under the terms of the plan."  Joyce seeks to enforce his rights because of the denial of LTD benefits, so his claims arise under § 502(a)(1)(B).  The language of the Plan designates LINA as the "Plan Administrator," thereby making LINA "the designated fiduciary for the review of claims for benefits under the Plan . . . ."  (ECF No. 56-3, p. 2).

The parties agree that the arbitrary and capricious standard applies here, and the Court concurs.  The arbitrary and capricious standard of review allows the Court to overturn a plan administrator's determination if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Miller v. Am. Airlines Inc.*, 632 F.3d 837, 845 (3d Cir. 2011) (quoting *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)).  The arbitrary and capricious standard in ERISA contexts, "however, is 'not without some teeth.'" *Martonik v. United of Omaha Life Ins. Co.*, No. 17-306, 2019 WL 3777842 (W.D. Pa. May 8, 2019) (quoting

12

*McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).  The Court must review case-specific factors.  *Est. of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)).  The Court will consider "procedural factors underlying the administrator's decision-making process, as well as structural concerns regarding how the particular ERISA plan was funded . . . ." *Miller*, 632 F.3d at 845.

Joyce makes four primary arguments in support of his motion: (1) LINA has a conflict of interest between its roles as both insurer and administrator of the Policy; (2) LINA's selective review and processing of the record created a procedural conflict; (3) LINA arbitrarily disregarded the SSA's award of disability benefits; and (4) LINA's denial of benefits stemmed from an incorrect occupational analysis.  The Court will address each argument in turn.

### A.    LINA's administration of benefits creates a structural conflict.

A conflict of interest exists when "a plan administrator both evaluates claims for benefits and pays benefits claims."  *Glenn*, 554 U.S. at 112.  "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"  *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187 cmt. d (Am. L. Inst. 1959)).  "In such a circumstance, 'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket.'"  *Glenn*, 554 U.S. at 112 (quoting *Firestone*, 489 U.S. at 144).  Though not dispositive, the Court must balance the structural conflict against all facts and circumstances of the issue at hand.  *Id.* at 112.  How heavily it weighs depends on "the precise nature of the funding arrangement in question."  *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162–64 (3d Cir. 2007).

LINA, under the Plan document, had discretionary authority to evaluate Joyce's claims for disability benefits and was also responsible for the payments of those benefits.  *See* (ECF No. 62,

p. 2).  LINA acknowledges the structural conflict but urges the Court to minimize this factor.  (ECF No. 69, p. 9).  While this factor is not dispositive, the Court holds that it favors Joyce's position.

**B.    LINA's review of the record creates a procedural conflict.**

"Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits.  It means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"    *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (quoting *Firestone,* 489 U.S. at 111).

When a claimant already receives benefits but is later denied such benefits, "[a]n administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels toward finding an abuse of discretion."  *Miller*, 632 F.3d at 848.  In *Miller*, the plan administrator abruptly terminated the plaintiff's LTD benefits after receiving updated medical reports from the plaintiff's physician suggesting that his mental conditions were asymptomatic.  *Id.* at 848–49.  The court noted, though, that the new reports did not "differ in any material aspect" from the received records.  *Id.* at 849.  The reversal of the decision was not supported by a record of a change of circumstances.  *Id.*  The Third Circuit held that "in the absence of any meaningful evidence to support a change in position, [the plan administrator's] abrupt reversal is cause for concern that weighs in favor of finding that its termination decision was arbitrary and capricious."  *Id.*

Joyce lost his STD benefits as they were about to convert to LTD benefits.  LINA's February 17, 2017 Decision Letter terminated Plaintiff's STD benefits stating, "[w]hile we are not disputing your diagnosis or symptoms you were having, we did not receive any medical notes from your provider before the deadline of February 15, 2017."  (ECF No. 62, pp. 14–15).  Joyce's treating neurologist and treating psychologist provided LINA with office notes, a letter clarifying those notes, completed medical request forms and behavioral questionnaires before the deadline.

14

*See* (ECF No. 56-19); (ECF No. 62, pp. 27–34); (ECF No. 70, ¶ 10); (ECF No. 78, p. 16).   LINA terminated Joyce's benefits with no countervailing medical evidence.   LINA also neglected to inform Joyce why the information LINA previously used to determine Joyce's benefits award no longer supported a disability finding.   That LINA denied STD benefits before converting them into LTD benefits without a change in the record is another factor the Court must consider, and the Court finds that it supports Joyce's position.

### 1) LINA's review of the record was selective.

The Court is limited in its review of an administrator's decision to the facts known to the administrator when the administrator made the decision.   *Branca v. Liberty Life Assur. Co. of Boston*, No. 13-740, 2014 WL 1340604 (W.D. Pa. Apr. 3, 2014) (citing *Post*, 501 F.3d at 168). "An administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion."   *Miller*, 632 F.3d at 848.   An abrupt reversal is troubling and supports finding that a determination was arbitrary and capricious.   *Id.* at 849.   Administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."   *Black & Decker,* 538 U.S. at 834.

LINA contends that its review of Joyce's record is thorough.   What LINA proffers, though, is its counsel's review of the file.   LINA's reports at the time of its decision each contain a long list of records, which Joyce and his care team provided, and a short blurb summarizing the provided records.   The records vary in length from seven to eleven pages, and the bulk of the report is the list and summary of the records.   LINA's reviewing physicians then make conclusory statements saying that their findings do not support "functional impairment necessitating restrictions or limitations." (ECF No. 64, p. 105).   Each report also concludes, without providing reasoning, that "from a neurology perspective" and "from a neuropsychological perspective" Joyce has no

impairment necessitating restrictions or limitations. (ECF No. 64, pp. 96, 105). Moreover, Dr.

Kertay relied on an incomplete record to formulate his opinion. He stated, "[f]urther specification

of injury severity is hampered by the fact that the original medical records from the injury are not

made available for review." (ECF No. 56-26, p. 2)

Dr. Ausi, Dr. Wright and Dr. Baird all believed Joyce to be disabled. The doctors for

LINA, Dr. Critchfield, Dr. Kertay and Dr. Meytin, never examined Joyce. Because Joyce's claim

involves both physical and mental impairments, it weighs against LINA that it relied so heavily

on opinions expressed by medical professionals who never examined Joyce. *See Schwarzwaelder*

*v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d 546, 559–60 (W.D. Pa. 2009) (finding that the fact

that the insurer relied heavily on a paper review of claimant's ailment favored the claimant).

Whereas some physicians "can 'formulate medical opinions based upon objective findings derived

from objective clinical tests,' a psychiatrist typically treats an individual's 'subjective symptoms.'"

*Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F. Supp. 2d 33, 49–50 (W.D. Pa. 2011)

(quoting *Sheehan v. Metro. Life Ins. Co.*, 368 F. Supp. 2d 228, 255 (S.D.N.Y. 2005)). "In contrast

to some physical impairments, which can be verified or discounted solely by reference to reports

of objective medical tests, mental impairments are generally identified based on a psychiatric

professional's interactions with an impaired individual." *Id.* at 50.

LINA does not need "to accord special weight to the opinions of a claimant's physician;

nor may courts impose on plan administrators a discrete burden of explanation why they credit

reliable evidence that conflicts with the treating physician's opinion." *Black & Decker*, 538 U.S.

at 834. Yet an ERISA plan administrator "may not arbitrarily refuse to credit a claimant's reliable

evidence, including the opinions of treating physicians . . . ." *Id.* The Court finds that LINA's

16

reliance on the opinions of its non-examining medical consultants against the treating physicians is a factor that favors Joyce.

**2) The LTD claims manager's involvement with the STD determination.**

LINA claims the LTD process for Joyce did not begin until 2019, nearly two years after Joyce's potential LTD start date. (ECF No. 69, p. 14). Yet, LINA's LTD claim manager was highly involved during the Elimination Period when Joyce's STD benefits would have converted into LTD benefits. LINA's LTD claim manager wrote the decision that terminated Joyce's STD benefits. LINA advances two opposing arguments claiming that the LTD process did not start until much later when, in fact, LINA's LTD claims manager was already involved at the STD stage.

**3) Independent medical examination ("IME").**

A plan administrator's failure to seek an independent medical examination ("IME") of a claimant before denying his application for benefits may "raise questions about the thoroughness and accuracy of the benefits determination." *Pini*, 981 F. Supp. at 414 (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005)).

Joyce asserts that LINA's failure to request an IME creates a procedural conflict. (ECF No. 59, p. 11). The Plan provides the Plan Administrator with the authority to have a physician examine a claimant "if required by the Insurance Company." (ECF No. 56-2, p. 10). "Where the plan at issue specifically provides a plan administrator with the authority to request an independent medical examination, the failure of the plan administrator to procure such an examination" may question the legitimacy of the determination by the plan administrator. *Haisley*, 776 F. Supp. 2d at 49 (quoting *Calvert*, 409 F.3d at 295). ERISA does not require a plan administrator to request a claimant to undergo a medical examination before the denial of a claim, but the failure to do so may be unreasonable where "specific impairments or limitations at issue are not amenable to

consideration by means of a file review." *Id.* (citing *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006).

LINA urges that the IME would have been of limited relevance. (ECF No. 69, p. 16). The focus of Joyce's disability for eligibility was the period of August 2016 to February 2017. By the time Joyce filed his LTD claim, LINA would not have been able to examine Joyce until mid-2019, well outside the period. (*Id.* at 17). Nor does the Policy mandate an IME. But as noted above, LINA claims the LTD process began later, but its LTD claims manager was involved in the denial of the LTD benefits. LINA's LTD manager's involvement suggests that the LTD process began much sooner than it argues. In *Haisley*, the district court questioned the lack of a medical examination because the claimant's condition could not be determined by reading the claimant's record. 776 F. Supp. 2d at 49–50. Similarly, Joyce's condition was not amenable to a paper review of his condition. Although it did not have to do so, LINA never asked Joyce to undergo any independent medical examination. That it failed to do so at the juncture of converting from STD to LTD weighs in Joyce's favor.

### 4) Incorrect job title.

A court may find a plan administrator's decision unreasonable if it does not discuss claimant's duties or claimant's ability to complete those duties. *Miller*, 632 F.3d at 849 (citing *Elliott*, 473 F.3d at 62F). Whether the decision incorporates and evaluates the correct job title factors into determining whether the decision was arbitrary and capricious. *Id.*

Joyce's occupation when he became disabled was "Route Manager," which required supervisory responsibilities, interaction with workers and management, knowledge of machines and equipment, and analyzing and resolving work problems. (ECF No. 56-1, p. 2). Joyce argued that neither LINA nor its reviewing physician considered his job duties in any respect in the three STD decisions. The final LTD decision identified Joyce's occupation as "Laborer," an occupation

18

requiring light demand activities according to the Dictionary of Occupational Titles. (ECF No. 64, p. 85). None of LINA's three reviewing physicians noted that they had considered a job description in any of their reports. Because the determination does not include the correct job description or provide any context of its review considering Joyce's occupation, the Court finds that this factor weighs toward a finding that LINA's determination was arbitrary and capricious.

### C.   LINA arbitrarily disregarded Joyce's award of Social Security disability benefits.

The award of SSD benefits weighs in Joyce's favor. *See Killebrew v. Prudential Ins. Co. of Am.*, 723 F. App'x 133, 135 (3rd Cir. 2018) (determining that the award of SSD benefits weighed slightly in favor of the claimant). An administrator's disagreement with the SSA's favorable decision about a plan beneficiary's entitlement to disability benefits is "relevant, though not dispositive . . . ." *Post*, 501 F.3d at 167. Under the Social Security Act, a person is "disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). To clarify, qualifying for SSD requires not only that the claimant be "unable to do his previous work" but also that he cannot "engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A). LINA only requires that the claimant be unable to perform the duties of his "Regular Occupation." (ECF No. 56-2, p. 7).

LINA highlights that the SSA's "determination of 'disability' is not binding in the instant case, where the determination is governed by the plan terms rather than statute." *Burk v. Broadspire Servs. Inc.*, 342 F. App'x 732, 738 (3d Cir. 2009). Although the SSA reviews SSD claims using "a uniform set of federal criteria," "employers have large leeway to design disability and other welfare plans as they see fit." *Black & Decker*, 538 U.S. at 833. LINA claims that it

appropriately considered the documents in its file. LINA also highlights that the disability awards were outside the period under consideration. (ECF No. 69, p. 19). Even so, the SSA found Joyce disabled under a much more demanding definition during the time his disability benefits were transitioning from STD to LTD. That the SSA found Joyce disabled under a narrower definition and that LINA failed to consider that fact in finding Joyce not disabled must be "considered as a factor in determining whether an ERISA administrator's decisions to deny benefits was arbitrary and capricious . . . ." *Brandenburg v. Corning Inc. Pension Plan for Hourly Emps.*, 243 F. App'x 671, 674 n.3 (3d Cir. 2007). While the SSA's determination is not dispositive, it, along with the consideration above, weighs in favor of finding an abuse of discretion.

### D.      LINA abused its discretion.

The Court finds LINA's process by which it decided to deny Joyce benefits under its LTD Policy to be deficient. LINA had an inherent conflict of interest as both the insurer and the administrator of the Policy, its record review was selective and incomplete, it failed to consider Joyce's disability benefits from the SSA and it based its occupational analysis on an inaccurate description of Joyce's "Regular Occupation" under the Policy. The Court's determination is not based on any one factor alone but "on the totality of [the insurer's] actions." *Sanderson v. Cont'l Cas. Corp.,* 279 F. Supp. 2d 466, 477 (D. Del. 2003).

The Court acknowledges that its scope of review is narrow and that the appropriate standard of review is "arbitrary and capricious." LINA homed in on the facts that most supported a finding that Joyce was not disabled while also refusing to acknowledge or reconcile information in contradiction of its finding. By providing conclusory statements and misconstruing Joyce's "Regular Occupation," LINA did not properly address all the facts and issues. When the Court considers LINA's assessment along with LINA's dual role as insurer and policy administrator, as well as Joyce's receipt of an SSA disability award under a more stringent standard, the balance of

the evidence shows that LINA's determination that Joyce was not disabled was "clear error," "not rational" and "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1141 (3d Cir. 1993); *Pinto*, 214 F.3d at 387. The Court holds that LINA's decision to deny LTD benefits to Joyce was arbitrary and capricious.

### E.     Remedy.

In its Motion for Summary Judgment, LINA requests that, should the Court find that LINA abused its discretion in denying Joyce's claim for benefits, it should remand this matter to LINA for further administrative review and determination of Joyce's claim under the "Any Occupation" provision of the Policy. (ECF No. 57, p. 23).

Bearing in mind the high "abuse of discretion" standard applicable here, and recognizing that the Court has confined its review to LINA's analysis under the "Regular Occupation" provision of its Policy, the Court will not address whether Joyce is entitled to benefits under the "Any Occupation" provision of the Policy. The appropriate remedy is remand to LINA for reevaluation of Joyce's LTD claim. Generally, when a person is wrongfully denied benefits, a court should remand the claim to the plan administrator for proper deliberation considering the deficiencies identified by the court. *Miller*, 632 F.3d at 856. If a plan administrator denies benefits at the outset, "it is appropriate to remand to the administrator for full consideration of whether the claimant is disabled." *Id.* "To restore the status quo, the claimant would be entitled to have the plan administrator reevaluate the case using reasonable discretion." *Id.* at 856–57. This case involves a wrongful denial of benefits. Thus, the Court will restore the status quo and remand to LINA for reevaluation of the claim using reasonable discretion.

### CONCLUSION

The Court denies Defendant LINA's Motion for Summary Judgment in its entirety and grants Plaintiff Joyce's Motion for Summary Judgment as to LINA's liability under § 502(a)(1)(B)

of ERISA under the "Regular Occupation" provision of the Policy.  For the reasons set forth above, the Court grants Joyce's Motion for Summary Judgment (ECF No. 58).  LINA's Motion for Summary Judgment (ECF No. 54) will be denied as moot.  This matter will be remanded to LINA for reevaluation of Joyce's claim considering the factors above.  An Order of Court will follow.[2]

BY THE COURT:

2/10/2021
Dated

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

---

[2] Joyce has requested an award of attorneys' fees.  The Court will entertain such a motion should it be filed.